IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DOUGLAS ELMORE,

              Petitioner,

vs.

TAMMY FOSS, Acting Warden, Salinas
Valley State Prison,[1]

              Respondent.

No. 2:16-cv-01453-JKS

MEMORANDUM DECISION

Douglas Elmore, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas
Corpus with this Court pursuant to 28 U.S.C. § 2254. Elmore is in the custody of the California
Department of Corrections and Rehabilitation and incarcerated at Salinas Valley State Prison.
Respondent has answered, and Elmore has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On September 17, 2010, Elmore was charged with the murders of Tammula Robbins
(Tammy) and her boyfriend Shawn Cope, use of a firearm, and multiple-murder special
circumstance allegations. The information further alleged that Elmore had suffered a prior
serious felony conviction. Elmore pled not guilty, denied the allegations, and proceeded to a
jury trial on April 4, 2012. On direct appeal of his conviction, the California Court of Appeal
laid out the following facts underlying the charges against Elmore and the evidence presented at
trial:

---

[1]       Tammy Foss, Acting Warden, Salinas Valley State Prison, is substituted for
Christian Pfeiffer, Warden, Kern Valley State Prison. FED. R. CIV. P. 25(c).

The victims were found to be absent from their Sacramento residence on Sunday morning, October 11, 2009, and were found dead 12 days later, on October 23, 2009, in garbage cans near the house.

The 39th Street house was also occupied by [Elmore's] mother (Rita Rose), Tammy's mother (Joleen Robbins), and a wheel-chair bound man ("Junior") who was almost never there and was not there during the time in question. Tammy and Cope slept on a mattress on the living room floor. About three weeks before the victims' disappearance from the home, [Elmore] came to stay with his mother while his fiancée's house was being worked on and his fiancée and children were staying in Fairfield. [Elmore] slept in his mother's bed (at her insistence), and she slept on the bedroom floor.

Tammy was her mother's in-home care worker, but [Elmore's] mother considered Tammy's performance "[n]ot up to par."

Tammy and Cope were close friends with Bernardo Quiroz and his wife Marlene Keola. On the evening of Saturday, October 10, 2009, the four smoked marijuana and watched a movie at the 39th Street house. The visitors left, but Quiroz later returned with his father-in-law to sell marijuana to Tammy—a fact Quiroz omitted in his first police interview but supplied in his second interview. When Quiroz returned, [Elmore] was in the front yard with his girlfriend and children. [Elmore's] mother, Tammy's mother, and the victims' friend Laurie Clark were also in the yard. Quiroz testified this happened on Saturday night, but Clark said it was Friday. During his trial testimony Quiroz was hostile toward [Elmore]; he stared fixedly at [Elmore], said [Elmore] was ugly and "better hope I don't ever go to jail." The court admonished Quiroz several times.

Quiroz went to the 39th Street house around 11:00 a.m. Sunday, October 11, asking for Tammy and Cope. [Elmore's] mother said they were gone. The next day, Tammy's mother found Tammy's cell phone in the house.

On Tuesday, October 13, a sheriff's deputy came to the house and took a missing person's report. The deputy returned to the house later that day, after Quiroz found blood on the living room couch and two bloody pillows and a blanket in the back yard. Tammy's mother attributed the stains to Tammy's "female issues." [Elmore's] mother told the deputy she had not noticed anything unusual, and Tammy and Cope sometimes take off without telling anyone.

Quiroz found the police response lacking and put up fliers with the missing couple's photograph. He checked the house's outside garbage cans but saw only tree clippings.

Soon after the victims' disappearance, David Satyna and girlfriend Michelle Schortgen moved into the 39th Street home. Satyna had visited on prior occasions. On one prior occasion, Quiroz knocked Satyna unconscious after learning Satyna had been exposing himself to a neighbor's child.

About a week after the disappearance, a bad smell developed around the house. Sheriff's deputies noticed the smell when they went to the house on the evening of October 22, 2009, in response to a call from Tammy's mother about finding a suspicious jacket. The deputies did not consider the jacket suspicious but did notice the foul odor. It appeared to come from the side of the house, where the deputies found a pile of clothes and debris. They poked at the pile with a stick. Using a flashlight in the dark,

they lifted lids off two trash cans and saw only lawn and tree clippings.  They told the occupants to clean up the yard.

[Elmore's] mother was the person who generally took the trash cans to the curb on Monday mornings.  On the two Mondays after the victims disappeared, no one took the trash cans to the curb.

On October 23, 2009, neighbor Sandra Cardenas noticed [Elmore's] mother and two other women putting black plastic trash bags in a car.  They drove off and returned 10 minutes later.  Around 3:00 p.m., Cardenas saw Satyna standing near the garbage cans that were now in front of [Elmore's] mother's residence.  Satyna looked around in all directions, as if checking to see whether anyone was watching him.  He grabbed one of the cans and ran to a nearby field, wheeling the can behind him.  He came running back a few minutes later without the garbage can, ran into the house, came out with a bag, and rode off on his bike.  Neighbor Denise Abbott saw and found suspicious Satyna's conduct outside the house, hunching over with his hands on his knees and breathing heavily before he entered the house.

Sheriff's deputies responded to a call about a man pushing a trash can into a field.  In the field they found an overturned trash can, a corpse, a tarp, some bedding, yard debris, and household trash.  They learned Satyna had taken the garbage can to the field to dump it, and the dead body fell out of the can.  In another garbage can in front of the victims' home, deputies found the other corpse covered by yard clippings and household trash.  [Elmore's] mother directed deputies to a nearby dumpster, where they retrieved two torn trash bags containing bedding and pillows.

The pathologist estimated the female victim weighed about 250 pounds when she died, and her decomposed corpse weighed 140 pounds when found.  The male weighed between 120 and 150 when alive and 51 pounds when found.  Tammy had three gunshot wounds.  One bullet—a medium caliber consistent with a nominal .38 caliber—entered the left side of her forehead, just above her left eye, traveled in a downward trajectory, and lodged on the right side of the skull by the neck.  Decomposition of the body prevented a determination of the distance from which the gun was fired.  Another bullet entered her left shoulder blade and exited out the right breast, in a horizontal trajectory.  The third gunshot wound passed through her right arm near the biceps and moved in downward trajectory toward her right elbow.  The third wound could have been re-entry of the second bullet if she had her arm folded up by the breast.  Thus, the forensic evidence was consistent with her having been shot while lying on her side or stomach.

Cope had a single, fatal gunshot wound.  The bullet entered the middle of his forehead, traveled from front to back, a little bit left to right and downward, and lodged at the back of the skull.  Cope would have been facing the shooter.  Cope also had fractured bones, some caused by blunt force trauma to the bone between the nose and teeth.

[Elmore's] mother testified she saw nothing and knew nothing and claimed she must have been hallucinating from her mental illness when she told police the opposite in videotaped interviews, portions of which were played for the jury.

The day the bodies were found, [Elmore's] mother told police she had no knowledge what happened, and it was common for the victims to disappear for a few days without telling anyone.

The next day, Detective Paul Belli was at the house for further investigation. [Elmore's] mother approached him, said she had more to tell him, and invited him to her room, where she had an open Bible. She said her son killed the victims. She agreed to be interviewed at the sheriff's department.

In her first videotaped interview, on October 24, 2009, [Elmore's] mother said she heard gunshots on the night in question, went into the living room and saw [Elmore] with a gun in his hand looking out the window. [Elmore] looked at her with a "scared stare." [Elmore's] mother saw the victims laying on their bed and thought they were sleeping but also said she thought they were dead. Cope was on his back with a bloody nose, and Tammy was "[l]ike on her side or on her stomach" (which turned out to be completely consistent with the forensic evidence presented at trial). [Elmore's] mother did not know what to think. His mother was scared and retreated to her bedroom. She heard but did not see [Elmore] moving around the house and outside. She went to use the bathroom and saw a lot of blood and the victims' bed pillows and blanket in the bathtub. She again returned to her bedroom.

In the second recorded police interview on November 5, 2009, [Elmore's] mother gave the same information as on October 24 and added that, when [Elmore] later left the house, she asked him what she should do, and he said, "You never [saw] me. I wasn't here." After [Elmore] left, his mother went into the bathroom and saw the bathtub was now clean.

In her trial testimony, [Elmore's] mother made every effort to recant her statements to police as the hallucinatory ravings of a lunatic. She repeatedly described herself as mentally ill. When she made the statements to police, she had been off psychiatric medications for at least three years. She later resumed seeing a psychiatrist and was taking Prozac for depression, Lorazepam for anxiety attacks, and Risperdal. On cross-examination by her son's attorney, [Elmore's] mother recounted her extensive mental health history, including holds at mental health facilities under Welfare and Institutions Code section 5150. In 2003 or 2004, she assaulted a neighbor after hallucinating that the neighbor stole documents to get [Elmore] in trouble. Doctors prescribed medications, but [Elmore's] mother did not take them. [Elmore's] mother was placed on another hold in March 2005, was prescribed antipsychotic medication, but did not take it.

Laurie Clark testified she was friends with the victims and went to grade school with [Elmore]. After the victims disappeared, [Elmore's] mother told Clark not to let the police know that [Elmore] had been at the 39th Street house. Quiroz testified [Elmore's] mother also wanted Quiroz to agree that [Elmore] was not there because she did not want him to get in trouble.

In closing argument, [Elmore's] trial counsel attempted to point the finger at Quiroz and even insinuated that maybe [Elmore's] mother was the murderer, with no involvement by [Elmore].

*People v. Elmore*, No. C072454, 2015 WL 7756762, at *1-4 (Cal. Ct. App. Dec. 2, 2015).

During jury deliberations, the trial court conducted a hearing about one juror's reported refusal to deliberate. The court found that the juror had intentionally concealed negative experiences with law enforcement during voire dire and replaced the juror with an alternate. At the conclusion of deliberations, the jury found Elmore guilty on both murder counts and found true the firearm and multiple-murder allegations. The trial court found true the prior serious felony allegation, which related to a 2004 burglary conviction. The court sentenced Elmore to life imprisonment without possibility of parole ("LWOP") and a consecutive term of 50 years to life imprisonment for the two firearm enhancements.

Through counsel, Elmore appealed his conviction, arguing that: 1) the trial court abused its discretion and violate Elmore's Sixth Amendment jury trial rights by removing the last holdout juror; 2) the trial court violated Elmore's right to present a defense when it prejudicially excluded testimony about Rita Rose's history of bizarre behavior; 3) the trial court committed reversible error when it failed to instruct the jurors that they should view evidence of Elmore's pre-offense statements with caution; 4) trial counsel was ineffective for failing to seek an instruction that a third party's attempts to suppress evidence can be imputed to the defendant only if the defendant knew about the conduct and authorized it; 5) the prosecutor committed misconduct by pointing out that Elmore had laughed at trial when seeing Rita Rose's distress during her videotaped interview with law enforcement that was played for the jury; and 6) the cumulative prejudicial effect of the various errors warranted reversal of his conviction. The California Court of Appeal unanimously affirmed the judgment against Elmore in a reasoned, unpublished opinion issued on December 2, 2015. *Elmore*, 2015 WL 7756762, at *13. Elmore

petitioned for review in the California Supreme Court, which was summarily denied on March 9, 2016.

Elmore then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on June 15, 2016.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Elmore raises the same arguments he raised to the California state courts on direct appeal, namely that: 1) the trial court abused its discretion and violated his Sixth Amendment rights by removing the last holdout juror; 2) his right to present a defense was prejudicially curtailed by a trial court ruling that excluded testimony about Rita Rose's history of bizarre behaviors, and the prosecutor committed  misconduct by taking advantage of the omission; 3) the trial court committed reversible error by failing to instruct the jurors that they should view evidence of Elmore's pre-offense statements to his mother with caution; 4) trial counsel rendered ineffective assistance by failing to seek an instruction that a third party's attempt to suppress evidence can be imputed to the defendant only if he knew about the conduct and authorized it; 5) the prosecutor committed misconduct by pointing out that Elmore had laughed when Rita Rose's videotaped interview with law enforcement was played at trial; and 6) the cumulative effect of the errors warranted reversal of his conviction.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"
§ 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Elmore has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

### Ground 1.    Dismissal of Holdout Juror

Elmore first contends that the trial court violated his rights to due process and to a unanimous jury verdict when it dismissed a juror during deliberations. In rejecting this claim on direct appeal, the Court of Appeal described the following underlying facts:

> During voir dire, the court asked prospective jurors including Juror No. 6: "Have you, a family member or close friend ever had a negative experience with law enforcement that didn't necessarily result in an arrest, but it was still negative for you?" No one responded. The court then asked Juror No. 6 about himself. He said he was self-employed training school teachers and administrators and was a former principal of Luther Burbank high school.

The jurors began deliberations on Monday, April 16, 2012. At 3:30 p.m. the next day, the jury informed the court it was unable to reach a verdict. The jurors had voted three times; the results were 10–2, 11–1, and 11–1, on both counts. Over defense objection, the court gave the jurors additional instructions, excused them for the day, and ordered them to resume deliberations the next day. The next day, the jury sent the court a note at noon asking, "What do we do when we have a juror who's not following the rules?"

The court told the parties it would conduct narrow questioning.

First up was the foreperson, Juror No. 12, who said Juror No. 6 within the first hour of deliberations made comments that the other jurors would have to convince him. He called the three police officers the Three Stooges. When the jurors wanted to go over some evidence, he threw up his hands and said he was done.

The trial court questioned the other jurors, most of whom said Juror No. 6 made up his mind early and was no longer engaging in deliberations. Some said he had a bias against police officers or detectives.

The trial court asked Juror No. 6 if he had a bias and, if so, whether he had been able to set it aside. The juror said, "I have been able to put any bias that I may have aside." The judge mentioned the voir dire question about bias against law enforcement. The juror said he has had "both positive and negative relationships with police officers over a period of time" and was "sure" he answered the question during voir dire. He believed he was participating in deliberations. He understood the prosecution did not have to prove motive. When the court asked if he was biased against law enforcement, Juror No. 6 said, "I don't have a bias. I think I understand the positive and the negatives relating to the law enforcement." He admitted referring to the police officers as the Three Stooges.

The court did not recall Juror No. 6's answer during voir dire to the question whether the juror had any negative experiences with law enforcement officers. When the court now asked Juror No. 6 about negative experiences with law enforcement, he said, "I got a ticket for making an illegal right turn, and I took it to court I guess and I won." "[T]he only thing negative about it was I was accused of doing something, and the officer really didn't have all of the information to . . . make a judgment in the first place." He also said, "as a high school principal probably, um, watching officers break up a fight a little more heavily than I would have liked maybe. [¶] . . . [¶] Stopping the kids in front of the school or those kind of issues, you know, but I had good relationships with the captain, and I could call him and he would always straighten those kind of issues out for me." The juror said he had also known some good school resource officers (SROs). One negative experience was that a new SRO "almost started a riot"; he was "walking around excited about being on campus and started talking to students and conversation got out of hand. And he didn't understand where to go from when things got bad to worse so to speak. We had to go and rescue him, that kind of thing. I mean we didn't want our kids to get shot or maced or anything like that. So we had to come to his assistance." By the time Juror No. 6 got there, the SRO was surrounded by 15 or 20 kids. Juror No. 6 got the SRO replaced. "If you don't have the kid skills, you don't do well in that position."

Another negative experience was that Juror No. 6's child attends school in Natomas, and the juror was part of the community organization making sure the school is a place the parents can be proud of, and "[o]ne of the things we did not like was how, um, police interacted with our kids." "[T]hey were too quick to arrest. I mean they would arrest for fighting. And the days that I went to school we never sent kids to jail for fights. Just typical—it just seemed we had—and it was really one bad officer, and we had to really work hard to get rid of him." It took most of the year to get rid of him. This happened a couple of years ago.

The juror said his own son "got stopped by the local security" four or five years earlier, when the son was 11 years old. Paladin security stopped the child and "wasn't satisfied with his answers. And we're talking I got the greatest kid in the world." The Paladin security person "decided that he needed more information from the kid. He needed the color of law. So he held my . . . kid there when he was with his friend and called in Sac P.D. to come in. And I didn't take kindly to that as a parent. And we had all the officers, we had their bosses in my house explaining to me how that's possible that a Paladin person can stop my kid. Then a police officer will come in and intercede in my community?" The juror said he was satisfied with the police response to the Paladin situation. The police officer asked the child a couple of questions and let him go. The juror had the meeting at his house because he wanted the police to explain how Paladin had the right to stop his son.

The trial court then asked:

"Q Okay. During voir dire when we were questioning prospective jurors do you remember me asking if you ever had a negative experience with law enforcement that didn't necessarily result in an arrest, but it was still negative for you? Do you recall that question being asked by me?
"A You know, as you say that I do remember the question.
"Q Okay.
"A I do remember the question.
"Q Okay. Anything else, Counsel?
"A Well—
"Q I'm sorry. Go ahead.
"A I do remember the question. Go ahead. I don't know where I was.
"Q Okay. I appreciate that."

The trial court found Juror No. 6 committed misconduct by intentionally withholding during voir dire a bias against law enforcement that, if it had been disclosed, would most assuredly have resulted in a peremptory challenge. The prosecutor confirmed he would have excused the juror. The court found the negative experiences described by the juror were of such a nature that he could not have unintentionally forgotten about them when he sat silent in response to the court's question about negative experiences with law enforcement. The court disbelieved the juror's claim that he could be impartial. The court said the juror "did acknowledge that during initial voir dire at least sort of—and I put that in quotes—sort of that he equivocated, but then he did

acknowledge, yes, he did recall being asked the question about negative experiences with law enforcement."

  The court noted the other jurors said [Elmore] appeared biased against law enforcement during deliberations.  The court noted that when it gave the jury additional instructions in response to the deadlock, Juror No. 6 had his back turned to the judge for half the instruction.  The trial court rejected defense counsel's spin attributing the juror's posture to a quest for comfortable accommodation of his six-foot-plus height.

  After argument by counsel, the trial court reiterated its findings that the juror had deliberately withheld information during voir dire.  He had an agenda and was dishonest with the court.  He had a bias and prejudged the case.  The court found the juror had not deliberated in good faith but was not removing him for failure to deliberate.

*Elmore*, 2015 WL 7756762, at *10-12.

  The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. CONST. AMEND. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Green v. White*, 232 F.3d 671, 676 (9th Cir. 2000).  Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see also United States v. Plache*, 913 F.2d 1375, 1377-78 (9th Cir. 1990).  An impartial jury consists of jurors who will conscientiously apply the law and find the facts.  *Lockhart v. McCree*, 476 U.S. 162, 178 (1986).

  In accordance with these protections, the Sixth Amendment does not prohibit the mid-deliberation dismissal of biased jurors or jurors who are unable to serve or engage in misconduct.  *See, e.g.*, *Williams v. Johnson*, 840 F.3d 1006, 1010 (9th Cir. 2016); *Perez v. Marshall*, 119 F.3d 1422, 1427 (9th Cir. 1997) (collecting cases from other circuit courts); *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985).  However, a court may not discharge a juror on account of his views of the merits of the case.  *See United States v. Symington*,[2] 195 F.3d 1080,

---

  [2] In *Symington*, the Ninth Circuit held that, "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror."  *Symington*, 195 F.3d at 1087 (emphasis

1085 (9th Cir. 1999) (quoting *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir. 1997) ("To remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict.")).  This is because an essential feature of the jury trial right is that only the group of jurors determine guilt or innocence.  *Williams v. Florida*, 399 U.S. 78, 100 (1970).  Selective dismissal of jurors based on their views of the merits of the case would obstruct the jury's independence, eliminate the necessary secrecy of deliberations, and vitiate the essential role of the jury to act as a safeguard against the power of the state and the court. *Symington*, 195 F.3d at 1085-86.

California Penal Code § 1089 provides for the substitution of jurors as follows:

> If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.

The Ninth Circuit has held that § 1089 is facially valid and retains the "essential feature" of the jury required by the Sixth and Fourteenth Amendments.  *Miller*, 757 F.2d at 995.  Thus, in considering a petition for habeas relief concerning the removal of a "hold-out" juror, this Court must assess the state court's application of § 1089 by determining: 1) whether good cause existed for the trial court to excuse the juror; and 2) whether Sixth Amendment rights were

---

in original).  But as the U.S. Supreme Court has recognized, *Symington* "do[es] not bind" the California courts "when [they] decide[] a federal constitutional question".  *Johnson v. Williams*, 133 S. Ct. 1088, 1098 (2013); *see also Williams*, 840 F.3d at 1010 (quoting *Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir. 2004) (holding that a habeas petitioner's reliance on *Symington* was "misplaced" because "*Symington* is not a Supreme Court case" and because *Symington*'s analysis was based on the Federal Rules of Criminal Procedure rather than the Sixth Amendment")).  The *Symington* rule therefore does not apply here.

violated by excusing a juror when it was known that the juror was the lone juror holding out for an acquittal. *Perez*, 119 F.3d at 1426.

On habeas review, a trial court's findings regarding good cause and juror fitness are entitled to special deference. *Id.*; *cf. Patton v. Yount*, 467 U.S. 1025, 1036–38 & n.12 (1984) (whether juror can render impartial verdict is question of historical fact entitled to special deference). The trial court is in a superior position to observe the juror's physical appearance and demeanor and thereby to determine whether the juror has an opinion or disability that disqualifies the juror or impacts his or her ability to continue deliberating. *Perez*, 119 F.3d at 1427. Whether a trial court violates a defendant's Sixth Amendment right to a jury trial by excusing a juror for good cause and replacing that juror with an alternate is a question of law. *Id.* at 1426.

Applying these legal principles to Elmore's claim, the state court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. While the record indicates that the court was aware that the dismissed juror was the lone holdout, that fact alone is not dispositive. *See id.* at 1427 (dismissal of holdout juror permissible because juror's emotional instability that made her unable continue deliberating provided good cause for her dismissal). As the Ninth Circuit explained in *Perez*, "[t]he fact that the trial judge knew that [the juror] was the sole juror holding out for an acquittal when he dismissed her does not invalidate his decision to excuse her from jury service." *Id.* at 1426. The *Perez* Court reasoned that the trial judge was "forced to act, not because of [the juror's] status as a holdout juror, but because of [the juror's] emotional inability to continue performing the essential function of a juror-deliberation." *Id.*

Similar to *Perez*, as the Court of Appeal found in rejecting Elmore's claim on direct

appeal:

> [T]he record as a whole, recounted above, clearly shows that the trial court's stated reasons for discharging the juror (withholding information during voir dire and dishonesty) appeared as a demonstrable reality.
>
> [Elmore] argues the incident about his traffic ticket was trivial, and he won in court. But the juror expressly stated it was "negative" in that the officer accused him without grounds. Moreover, [Elmore] cites no authority that each incident must be separately significant enough to generate bias, rather than bias developing from a cumulative effect of several incidents.
>
> [Elmore] argues the incident with the juror's son was not a negative experience with law enforcement but merely a negative experience with a private security company. Not so. The juror made "all the officers" and their "bosses" come to the juror's home to explain how Paladin could "stop my kid. Then a police officer will come in and intercede in my community?"
>
> [Elmore] argues the juror was not required to disclose the other incidents during voir dire because they were not negative experiences for the juror, his family members, or close friends—the only persons mentioned in the voir dire question. However, they were negative experiences for the juror. Though he was not the target of the police conduct, the question did not require that the juror be the target. Moreover, the totality of these incidents, together with the other incidents, obviously shaped the juror's bias against law enforcement.
>
> [Elmore's] reply brief takes issue with the People's argument that the juror, by stating, "I don't know where I was," admitted he had no good reason for failing to respond to the question in voir dire. [Elmore] argues "it is clear that [the juror] simply meant that he had lost his train of thought after the court interrupted him seconds earlier." We do not see it as "clear," but in any event we do not rely on [Elmore's] answer to the court's question in finding no error in the court's dismissal of this juror.

*Elmore*, 2015 WL 7756762, at * 13.

The Ninth Circuit's decision in *Sanders v. Lamarque*, 357 F.3d 943 (9th Cir. 2004), does

not compel a contrary conclusion. In *Sanders*, the Ninth Circuit distinguished *Perez* and granted

habeas relief where the trial court removed the lone holdout juror, concluding that there was

strong evidence that the removal was motivated by the trial court's desire to have a unanimous

verdict. 357 F.3d at 950. However, *Sanders* is factually distinguishable from the case here. In

*Sanders*, unlike in Elmore's case, the trial court dismissed who it knew to be the lone holdout

14

juror when there was no evidence that the juror concealed information during voir dire, nor any evidence that the juror harbored bias or impermissible prejudice during the deliberation process. 357 F.3d at 950. Because there was evidence in this case that the dismissed juror made material misrepresentations during voir dire, *Sanders* does not apply.

In this case, the state court's conclusion is reasonable and fully supported by the record. Its determination that the juror was properly discharged was not contrary to or an unreasonable application of clearly established federal law nor was it based on an unreasonable determination of the facts. Elmore therefore fails to demonstrate that his constitutional rights were violated by the discharge, and he is not entitled to habeas relief.

**Ground 2.        Evidentiary Error/Confrontation Violation**

Elmore next argues that the trial court improperly excluded testimony about Rita Rose's history of bizarre behaviors, and the prosecutor committed misconduct at trial by taking advantage of the omission**.** According to Elmore, the trial court erred in excluding testimony from Rose's former landlord that he twice evicted her based on accusations she had made that other tenants in her apartment complex were having affairs. The Court of Appeal considered and rejected this claim on direct appeal as follows:

> **A. Background**
>
> [Elmore] moved in limine to introduce testimony from property manager Cliff Livens that in 1998, when d [Elmore's] mother was a tenant at the apartment complex he managed, she "made up affairs that different individuals within the apartment complex were supposedly having and behav[ed] in a very loud and bizarre manner in making these accusations in public locations." Defense counsel said, "basically similar things" happened in 2006 at a different apartment complex, but counsel did not have specifics.
>
> The trial court excluded the evidence because it was remote in time in relation to [Elmore's] mother's police interview in November 2009 (which the court misstated as "2010") and it did not shed light on whether [Elmore's] mother was hallucinating when she spoke with police at that time. The court observed that maybe people were having affairs. In the court's view the property manager's testimony would have been

cumulative to other evidence about [Elmore's] mother's mental health issues including her own anticipated testimony that she hallucinates and has mental health issues. The trial court rejected the defense's proposal that the court hold an Evidence Code section 402 hearing.

The trial court also excluded [Elmore's] mother's psychiatric records, which defense counsel agreed were inadmissible. He provided them to the prosecution only to demonstrate he had a good faith basis to explore the subject when he cross-examined [Elmore's] mother.

In closing argument to the jury, the prosecutor argued [Elmore's] mother had exaggerated her mental health issues "to try and seem worse," and "It was intensely obvious when she couldn't remember the answers to questions when I asked them, but she remembered the answers to all of the questions when [defense counsel] asked. Because she thought that [defense counsel] was trying to help her son, so she wanted to help him. She didn't need to try to play out and exaggerate her symptoms at that point."

Defense counsel argued to the jury that [Elmore's] mother was like mathematician John Nash as portrayed in the movie "A Beautiful Life [Mind]" in that both were in and out of hospitals and battled hallucinations but could come to their senses with medication.

In rebuttal argument, the prosecutor said, "We know for a certainty that she's had no mental health hospitalizations since 2005. We don't actually know much about any mental health hospitalizations in 2005 because all that was produced on that was Rita Rose saying that she had mental health hospitalizations and her saying that she had issues." The defense objected this misstated the evidence, and the court reminded the jurors they were the fact finders. The prosecutor continued: "There's been no proof, there's been no one who come in and talk about any stays that Rita Rose has had at a mental hospital about anything like that. There was no one that talked about any issues that Rita Rose had with reality other than Ms. Rose, right? The people who knew Ms. Rose, the people who would have witnessed any kind of problems that she had with reality, those people came into court and all said that she was fine. There wasn't a single witness who said anything different other than Ms. Rose trying to accentuate, oh, the voices inside my head and things like that, right?"

**B. Analysis**

[Elmore] argues the trial court was wrong in excluding the property manager's testimony as remote. [Elmore] analogizes to admissibility of remote prior convictions where a defendant has not led a legally blameless life. [Elmore] argues the court was wrong in excluding the evidence as cumulative, because it was corroborating evidence that would rebut the inference urged by the prosecution that [Elmore's] mother's admission of her own mental illness was an exaggeration designed to recant her statements to police. [Elmore] argues the exclusion of the evidence deprived him of the federal constitutional right to present a defense challenging the credibility of [Elmore's] mother's statements to police.

The constitutional right to present a defense is subject to established evidentiary rules designed to assure fairness and reliability in the ascertainment of guilt and

innocence.  (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324 [164 L.Ed.2d 503]; *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297]; *People v. Lawley* (2002) 27 Cal.4th 102, 155 [ordinary rules of evidence do not impermissibly infringe on constitutional right to present a defense].)  The trial court has discretion to impose reasonable limits, and the reviewing court will not disturb the judgment absent a showing that the trial court abused its discretion.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125.)

Implicit in the trial court's ruling was that the property manager's testimony would require undue consumption of time on a collateral matter, because perhaps [Elmore's] mother was right about people having affairs, in which case she was just obnoxious, not hallucinatory.  On this record, it does not appear the property manager could have testified that no one was having an affair.

Moreover, even assuming [Elmore's] mother hallucinated in 1998 or even in 2006, such evidence would only be marginally probative, if at all, to show she hallucinated in her police interview in November 2009.  In making that determination, the jury was aware that her descriptions to police about the location of wounds and the positioning of the victims' bodies matched the forensic evidence exactly and the jurors were able to observe for themselves her demeanor during the videotaped police interviews.  A lay witness's opinion about her demeanor years ago, an opinion that could not be corroborated, added little if anything to the question whether she was hallucinating when she talked to the police after the murders here at issue.

We conclude there was no evidentiary error, and we therefore need not address [Elmore's] other arguments that evidentiary error was prejudicial.

As to [Elmore's] claim of prosecutorial misconduct (improperly presented under the heading of evidentiary error excluding the property manager's testimony), [Elmore] argues the prosecutor committed misconduct by arguing there was no proof that [Elmore's] mother had "ever" been in a mental hospital or had mental health problems, when the prosecutor knew about the hospitalizations.  However, the prosecutor did not deny hospitalizations but said, "she's had no mental health hospitalizations since 2005."

[Elmore] complains the prosecutor went on to refer to absence of hospital records that the trial court had found inadmissible.  Specifically the prosecutor said to the jury: "We don't actually know much about any mental health hospitalizations in 2005 because all that was produced on that was Rita Rose saying that she had mental health hospitalizations and her saying that she had issues."  [Elmore's] attorney then objected based on the fact that the argument misstated "the evidence."  The trial court did not expressly rule on the objection, but only reminded the jury that the jury was the ultimate finder of facts and the jury should "rely upon [what the jury had] heard and [the jury's] evaluation of the evidence.

As noted earlier, defense counsel agreed the records were inadmissible and said he provided them to the prosecution only to demonstrate a good faith basis to explore the subject when he cross-examined [Elmore's] mother.

Contrary to [Elmore's] contention, his objection that the prosecutor was misstating the evidence did not preserve an objection on the ground of prosecutorial misconduct in commenting about evidence that existed but could not be presented.

Defense counsel's objection that the prosecutor was misstating the evidence was not sustainable because the prosecutor's argument was an accurate statement of the evidence. If defendant had objected on the grounds of prosecutorial misconduct (as he does here), that objection could have been discussed and resolved in the trial court. (*People v. Thomas* (2012) 54 Cal.4th 908, 937–938 [claim forfeited where objection in the trial court was not on the specific ground of prosecutorial misconduct raised on appeal].)

[Elmore] cites *People v. Scott* (1978) 21 Cal.3d 284, 290, for the proposition that an objection may be deemed preserved where the record shows the court understood the true objection despite "inadequate phrasing." We find nothing in the record to suggest that the trial court understood that [Elmore's] objection was in fact one based on prosecutorial misconduct.

[Elmore] argues if he forfeited the objection, it is his trial counsel's fault. However, [Elmore] fails to show the prejudice element of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, [Elmore] must demonstrate his trial counsel's representation fell below an objective standard of reasonableness and the defect prejudiced [Elmore] in that there is a reasonable probability that, but for the deficiency, [Elmore] would have obtained a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688 [80 L.Ed.2d 674] (*Strickland*); *People v. Williams* (1997) 16 Cal.4th 153, 215 (*Williams*).)

[Elmore] argues he was prejudiced because his mother's statements to police were the only evidence of [Elmore's] guilt. However, [Elmore] does not argue the hospital records should have been admitted. Assuming defense counsel had made the objection, the trial court would, at most, have merely reminded the jurors not to speculate about matters not in evidence, as they learned from the jury instructions. There was no prejudice under any standard.

We conclude there is no merit to any of [Elmore's] multi-faceted arguments, improperly combined in violation of the obligation to present each argument under a separate heading (Cal. Rules of Court, rule 8.204).

*Elmore*, 2015 WL 7756762, at *4-7.

It is well-settled that a criminal defendant has a constitutional right to present a defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). This right is not, however, without limitation. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see Crane*, 476 U.S. at 689-690; *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6,

(1983); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554, 564 (1967). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Under these guidelines, this Court cannot find that the trial court's refusal to allow Elmore to present testimony regarding Rose's eviction was an abuse of discretion or unreasonable or contrary to federal law. Here, Elmore had an opportunity to extensively cross-

examine Rita Rose about any potential biases, inconsistencies, or other infirmities—and did so. Elmore argues that he should have been able to introduce extrinsic evidence attacking his mother's credibility. But the trial court properly determined that such evidence was not sufficiently relevant in this case. The proffered evidence, although relevant, had limited probative value. The trial court acted well within its discretion and within the bounds of the Confrontation Clause in determining that the limited probative value of the evidence was outweighed by the undue consumption of time that the presentation of such evidence would require as well as the danger of confusion to the jury. *See United States v. Scheffer*, 523 U.S. 303, 314 (1998) (noting that "collateral litigation prolongs criminal trials and threatens to distract the jury from its central function of determining guilt or innocence"). The trial court had legitimate concerns that proving up Rita Rose's alleged lying would have resulted in a "minitrial" that would have unduly complicated the matter.

In short, excluding the proffered evidence here did not violate the Confrontation Clause or Elmore's right to present a defense, nor was it contrary to any clearly established Supreme Court authority. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *cf. Guasch v. Cates*, No. C 10-5628, 2011 WL 2471029, at *11 (N.D. Cal. June 22, 2011) ("To have allowed a trial within a trial, that is, a trial of a witness's unrelated and as-yet unproven credit-card wrong within petitioner's own trial for trying to kill his wife would have been unwise. Defense efforts like this are routinely and rightly rejected without doing any damage to the Sixth Amendment."). Accordingly, Elmore is not entitled to relief on his Sixth Amendment claim.

To the extent Elmore raises here his contention raised on direct appeal that the prosecutor committed misconduct by exploiting the trial court's erroneous ruling, he is not entitled to relief

on that claim either. According to Elmore, the prosecutor committed misconduct by referring to the absence of hospital records relating to Rita Rose's mental health that the trial court had found inadmissible. The Court of Appeal rejected this claim due to a failure to object at trial. *Elmore*, 2015 WL 7756762, at *6. Consequently, because the state appellate court found Elmore's prosecutorial misconduct claim forfeited under California's contemporaneous objection rule, the claim is procedurally defaulted from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment). The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).

And even if the claim were not procedurally defaulted, Elmore's claim would still fail. Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct violated due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To prevail on such a claim, a petitioner must show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Moreover, "[o]n habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood*

*v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

Here, the Court of Appeal's rejection of Elmore's prosecutorial misconduct claim was not unreasonable. As the state court explained, "Assuming defense counsel had made the objection, the trial court would, at most, have merely reminded the jurors not to speculate about matters not in evidence, as they learned from the jury instructions. There was no prejudice under any standard." *Elmore*, 2015 WL 7756762, at *7. Accordingly, Elmore is not entitled to relief on any argument advanced in support of this ground.

**Ground 3.    Instructional Error**

Elmore additionally contends that the trial court erred in failing to sua sponte instruct the jury with CALCRIM No. 358 to view with caution his statement to his mother "You never [saw] me. I wasn't here." The Court of Appeal considered and rejected this claim as follows:

> CALCRIM No. 358 states: "You have heard evidence that the defendant made [an] oral or written statement (before the trial/while the court was not in session). You must decide whether the defendant made any [such] statement, in whole or in part. If you decide that the defendant made such [a] statement, consider the statement, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement. [¶] [Consider with caution any statement made by [the] defendant tending to show [his] guilt unless the statement was written or otherwise recorded.]"
> "When the evidence warrants, the court must instruct the jury sua sponte to view evidence of a defendant's oral admissions or confession with caution. [Citations.]" (*People v. Dickey* (2005) 35 Cal.4th 884, 905.) The standard of review for error is whether it is reasonably probable the jury would have reached a result more favorable to the defendant had the instruction been given. (*Ibid.*) Failure to give this instruction is not one of the narrow categories of error that render a trial fundamentally unfair for federal due process purposes. (*Ibid.*) The purpose of the instruction is to assist the jury in determining if the statement was in fact made. (*Ibid.*) Courts examining prejudice in omission of the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. (*Ibid.*) Where there was no such conflict, but simply a denial by the

defendant that he made the statement, courts have found the failure to give the instruction harmless. (*Id.* at p. 906.)

      Here, there was no conflicting evidence, or even a denial by [Elmore].

      [Elmore] argues he was prejudiced because, apart from his mother's testimony that [Elmore] told her to deny he had been at the house, her account was just as consistent with herself being the murderer with no involvement by [Elmore]. [Elmore] argues the mere fact that his mother lied about [Elmore's] whereabouts, and that [Elmore] told her to do so, would be enough to support an inference that she was lying at his behest; and that inference would not have been possible had the court instructed with CALCRIM No. 358 and had the jury found [Elmore] never made the statement in the first place. However, [Elmore] simply assumes the jury would have found he never made the statement. [Elmore] cannot show prejudice by assuming prejudice. It is not reasonably probable the jury would have reached a different result had the instruction been given.

      For the same reason, we reject [Elmore's] contention that trial counsel was deficient in failing to request the cautionary instruction. [Elmore] argues there could be no tactical reason not to ask for the instruction, but he fails to show the requisite prejudice.

*Elmore*, 2015 WL 7756762, at *7-8.

Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a

whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*. Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining

the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

Elmore has not met his heavy burden in showing the omission of this jury instruction so infected his trial that his resulting conviction violates due process. *Estelle*, 502 U.S. at 72. CALCRIM 358 essentially provides that the jury must decide whether the defendant made any alleged out-of-court statements in whole or in part, consider the statements along with all the other evidence, and consider the out-of-court statements with caution. *See* CALCRIM 358. The omission of CALCRIM 358 did not relieve the prosecution of its burden of proving every element of the charged crimes beyond a reasonable doubt. *See Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (a jury instruction violates due process if it fails to require the prosecution to prove every element of the offense) (citation omitted).

Moreover, in the context of the trial and the overall charges given to the jury, Elmore fails to establish a due process violation. The jury was instructed with CALCRIM 200, which states that the must decide what the facts are and must follow the law as instructed by the court, CALCRIM 226, which lists the factors relevant to assessing witness credibility, including whether a witness has deliberately lied about something significant in the case, and how reasonable the testimony is considering all the other evidence in the case, CALCRIM 301, which states that before the jury concludes that the testimony of one witness proves a fact, it should carefully review all the evidence, CALCRIM 316, which relates to assessing the credibility of a witness's testimony, and CALCRIM 318, which tells the jury how it may use evidence of statements a witness made before trial. These instructions as a whole were sufficient to apprise the jury of how properly to assess witness testimony. *See, e.g.*, *Ornelas v. Knipp*, No. 2:12-cv-

03097, 2014 WL 1665225, at *11 (E.D. Cal. Apr. 24, 2014) (finding no due process error for failing to give CALCRIM 358 in light of other instructions given to the jury).

Furthermore, as the Court of Appeal noted, Elmore's speculation that the jurors may have found that Elmore never made the statement if the trial court had given CALCRIM 358 is insufficient to show prejudice under *Brecht*. *See Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) ("The *Brecht* standard reflects the view that a 'State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.") (quoting *Calderon v. Coleman*, 525 U.S. 141, 145 (1998) (per curiam) ). It is not reasonably probable that Elmore would have received a more favorable result at trial had the court instructed the jury with CALCRIM 358, particularly in light of the prosecution's case. Elmore's instructional error claim thus does not merit federal habeas relief.

**Ground 4.    Ineffective Assistance of Counsel**

Elmore further argues that trial counsel rendered ineffective assistance by failing to request that the jury be instructed with CALCRIM No. 371C, which states that a third party's concealment of evidence is not attributable to the defendant unless he was present or authorized the concealment. There was evidence that his mother hid evidence by cleaning blood from the bathroom and throwing trash bags with bloody bedding into the dumpster and that Satyna tried to hide evidence by dumping the trash into the field. The trial court instructed the jury with CALCRIM No. 371A: "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he is aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance.

26

However, evidence of such an attempt cannot prove guilt by itself." Elmore faults counsel for not requesting Alternative C instead.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that appellate counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Elmore must show that counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Elmore fails to satisfy his burden with respect to either of the prongs. As the Court of Appeal explained, Elmore does show that counsel had no tactical reason for requesting Alternative A rather than Alternative C. *See Strickland*, 466 U.S. at 689-90 (reasonable tactical decision by counsel with which the defendant disagrees cannot form the basis of an ineffective assistance of counsel claim). Likewise, he fails to show that he would have achieved a more favorable result if Alternative C was given instead of Alternative A. The Court of Appeal found that:

> The defense may have preferred not to call additional attention to [Elmore's] mother's efforts to protect her son, preferring instead to insinuate that she concealed evidence to cover up her own crimes. While this theory was farfetched, defense counsel had little to work with. Moreover, had the instruction been given, the jurors may have inferred that [Elmore] authorized his mother's concealment efforts by telling her, "I wasn't here." Even if they concluded [Elmore's] mother acted on her own to protect her son, knowing he was guilty, [Elmore] would not have obtained a more favorable result.

*Elmore*, 2015 WL 7756762, at *9.

That conclusion is both reasonable and fully supported by the record. Elmore's ineffective assistance claim therefore must fail.

**Ground 5.    Prosecutorial Misconduct**

Elmore further avers that the prosecutor committed misconduct in summation by commenting that Elmore had laughed during trial as he watched his mother's distress in the videotaped interview. The record reflects that the prosecutor told the jury:

> Something else that you may have noted when we were playing clip five, that last clip in court for the first time. During those periods of intense emotion when Ms. Rose started to cry, you heard coming from [Elmore] snickering sounds. It sounded essentially like laughter. And what that demonstrated to you was how much regard [Elmore] has for his mom or for anyone else for that matter, and the answer would be not very much. Not very much.

*Elmore*, 2015 WL 7756762, at *9.

As an initial matter, because the state appellate court also found this prosecutorial misconduct claim forfeited under California's contemporaneous objection rule, the claim is procedurally defaulted from federal habeas review. *Coleman*, 501 U.S. at 729-30 (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment). As aforementioned, the Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong*, 420 F.3d at 1058; *Paulino*, 371 F.3d at 1092-93.

Nor is Elmore entitled to relief on the merits of the claim. Again, federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct violated due process. *See Darden*, 477 U.S. at 181. As the Court of Appeal reasonably concluded, "any inference would have come from [Elmore's] snickering, not from the prosecutor's brief mention of it." *Elmore*, 2015 WL 7756762, at *10. Elmore fails to show that

the prosecutor's comments so infected his trial as to constitute a due process violation, and he is not entitled to relief on this claim.

**Ground 6.     Cumulative Errors**

Finally, Elmore avers that the cumulative effect of the trial errors warrants reversal of the judgment against him.  "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).  Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted).  In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process.  *See Chambers*, 401 U.S. at 294.  As discussed throughout this opinion, however, Elmore does not allege any claims that amount to error, and thus he demonstrates no errors that can accumulate to a level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).  Accordingly, Elmore is not entitled to relief on his cumulative error claim.

## V. CONCLUSION AND ORDER

Elmore is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court issues a Certificate of Appealability solely with respect to his claim that the trial court violated his rights to due process and to a unanimous jury verdict when it dismissed a juror during deliberations (Ground 1). *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 14, 2018.

                                           /s/James K. Singleton, Jr.      
                                            JAMES K. SINGLETON, JR.
                                            Senior United States District Judge